## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| DANIEL COHEN<br>1437 Montclair Court<br>Smyrna, GA 30080,<br>Derivatively on behalf of WORKHORSE<br>GROUP, INC.,<br><br>And<br><br>DAVID COHEN<br>4363 Bridgehaven Dr.<br>Smyrna, GA 30080<br>Derivatively on behalf of WORKHORSE<br>GROUP, INC.,<br><br>         Plaintiffs,<br><br>     v.<br><br>DUANE HUGHES, STEVE SCHRADER,<br>ROBERT WILLISON, RAYMOND J.<br>CHESS, H. BENJAMIN SAMUELS,<br>GERALD B. BUDDE, HARRY DEMOTT,<br>MICHAEL L. CLARK, JACQUELINE A.<br>DEDO, and PAMELA S. MADER,<br>100 Commerce Drive<br>Loveland, OH 45140<br><br>         Defendants,<br><br>    -and-<br><br>WORKHORSE GROUP, INC., a Nevada<br>corporation,<br>100 Commerce Drive<br>Loveland, OH 45140<br><br>         Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER<br>DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

By and through their undersigned counsel, Plaintiffs David Cohen and Daniel Cohen ("Plaintiffs") bring this shareholder derivative action on behalf of Nominal Defendant Workhorse Group, Inc. ("Workhorse" or the "Company") and against certain current and former officers and directors of the Company for (i) issuing false and misleading statements in breach of their fiduciary duties; (ii) unjust enrichment; (iii) corporate waste; (iv) violations of § 14(a) of the Exchange Act and (v) insider selling. Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Workhorse and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, interviews, and other publications disseminated by certain of the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Workhorse's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class actions, *Farrar v. Workhorse Group, Inc. et al.*, No. 2:21-cv-02072 (C.D. Cal. Mar. 8, 2021) (the "Securities Class Action") and *In re Workhorse Group Inc. Derivative Litigation*, No.2:21-cv-04202 (C.D. Cal. May 19, 2021) (the "California Derivative Action"); and (e) review of other publicly available information concerning Workhorse and the Individual Defendants.

## NATURE AND SUMMARY OF THE ACTION[1]

1. This derivative action arises from the repeated false and misleading statements made on behalf of the Company by the Individual Defendants regarding the Company's ability to obtain a highly coveted delivery vehicle contract with the U.S. Postal Service ("USPS"), which

---

[1] All textual emphases in quoted material in this Complaint are added unless otherwise noted.

would replace approximately 165,000 USPS package delivery vehicles, and the exorbitant costs associated with selecting an electric vehicle for USPS's entire fleet, as well as other misconduct, beginning on July 7, 2020 and continuing through the present.

2.      Workhorse, a Nevada corporation with its principal place of business in Ohio, develops and manufactures electric delivery vehicles.

3.      In or around 2016, USPS announced the Next Generation Delivery Vehicle ("Next Gen" or "NGDV") project, a competitive multiyear acquisition process for replacing approximately 165,000 USPS package delivery vehicles.

4.      Workhorse was one of the companies vying for the Next Gen contract, which was thought to be worth approximately $6.3 billion.  The USPS ultimately selected Workhorse and four other participants to build prototype vehicles for the project.

5.      From March 10, 2020 and continuing to the present (the "Relevant Period"), the Individual Defendants touted the Company's ability to secure the lucrative contract with the USPS, actively concealed from the investing public the great costs associated with electrifying the entirety of the USPS's fleet, made Workhorse appear to have a backlog of orders which were actually fictitious, and concealing that the Company never had the ability to manufacture vehicles at scale. For example, defendant Steve Schrader ("Schrader"), the Company's Chief Financial Officer ("CFO") publicly touted Workhorse's "all-electric" vehicle as the only all-electric option the USPS was considering, which offered half the maintenance costs of the current USPS fleet, and that Workhorse's "all-electric [vehicle] is probably the perfect vehicle for [USPS]."  Moreover, both the Company's Chief Executive Officer ("CEO") and President, defendant Duane Hughes ("Hughes"), and defendant Schrader lauded the contract as "***transforming***" and "***changing***" for the Company.

– 3 –

6. In response to interview questions regarding President Joseph R. Biden's comments that the entire USPS fleet would be replaced with electric vehicles, defendant Schrader further averred, among other things, that "*I think the President's announcement was huge, for several reasons. . . . I think that's huge. I think it's meaningful that he did this his fifth day into his presidency, right? He did it quickly; he didn't really wait*" and that "*when you think about it, when the government gets behind things, things happen*." Schrader concluded, "*So yeah, having the government push us and the President come out, like I said, five days after his inauguration, is huge.*"

7. On February 23, 2021, however, the USPS issued a press release entitled, "U.S. Postal Service Awards Contract to Launce Multi-Billion-Dollar Modernization of Postal Delivery Vehicle Fleet," in which the USPS announced that Oshkosh Defense – not Workhorse – had been awarded the Next Gen contract.

8. On this news, the Company's stock price fell $14.87 per share, or 47%, on unusually heavy trading volume, to close at $16.47 per share on February 23, 2021. The price of Workhorse securities continued its precipitous decline in after-hours trading and opened on February 24, 2021 at $14.07 per share, a fall of over 50% from the previous open, erasing nearly $1.8 billion dollars in market capitalization.

9. As detailed further below, from at least July 7, 2020, and continuing through the present, the Individual Defendants caused Workhorse to issue false and misleading statements concerning the Company's business, operational, and compliance policies. Specifically, the Individual Defendants caused the Company to make false and/or misleading statements, and/or failed to disclose that: (i) the Company had no assurance or indication from USPS that USPS was going to select an electric vehicle as its Next Generation Delivery Vehicle, and the Company was

merely hopeful for this outcome despite failing to meet basic criteria for manufacturing capacity, design, and safety; (ii) the Company had concealed the fact that electrifying the USPS's entire fleet would be impractical and extremely expensive, as revealed by the postmaster general in explaining the USPS's decision not to select an electric vehicle; (iii) materially misrepresenting nonbinding interest in the Company's vehicles as a purported "backlog" of orders; and (iv) as a result of the foregoing, Workhorse's public statements were materially false and misleading, and/or lacked a reasonable basis at all relevant times. Through this scheme and through their material misrepresentations, Defendants misled the market to believe that Workhorse had moved beyond the research and development phase of the Company and into mass production, that the Company had a steady backlog and demand for their product, and that there was a strong possibility Workhorse would be granted all or part of the USPS contract.

10. Making matters worse, certain of the Individual Defendants (defined below as the "Insider Selling Defendants") took further advantage of Workhorse's securities trading at artificially inflated prices and sold their personally held Workhorse stock for millions of dollars in insider proceeds.

11. Unbeknownst to investors, Workhorse was nowhere near able to mass produce trucks, as the facility where the trucks were being assembled was understaffed, had no automation, and trucks were assembled one at a time on wooden work benches. Workhorse's backlog consisted of highly conditional agreements with entities who had no obligation to ever take delivery of the trucks. Additionally, by Workhorse's own admission, USPS decided early on, based on factors which Defendants were fully aware of, that the NGDV contract would not be awarded to Workhorse.

12.     As a result of the Individual Defendants' wrongful acts and omissions, and the swift decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

13.     Furthermore, the Wall Street Journal published an article on September 1, 2021 entitled "SEC Is Investigating Electric Delivery-Truck Maker Workhorse," revealing that the SEC disclosed in a letter denying a public records request that its enforcement division has been probing Workhorse.[2]  As a result, Workhorse shares fell 6.8% to $9.14 on the stock market.

14.     Workhorse's Board has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims. When Plaintiffs made a formal demand for litigation on the Board, the Board determined, without any investigation whatsoever, that it would indefinitely defer consideration of the Demand (defined below).  The Board's indefinite deferral of the Demand despite statute of limitations looming amounts to a *de facto* wrongful refusal of the Demand.  Thus, Plaintiffs rightfully bring this action in the name of, and on behalf of, Workhorse to vindicate the Company's rights against the Individual Defendants named herein, and to hold them responsible for the grievous damages that they, as wayward fiduciaries, have caused – and will continue to cause – the Company.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over the state law claims

---

[2] Ben Foldy, *SEC Is Investigating Electric Delivery-Truck Maker Workhorse*, The Wall Street Journal, Sept. 1, 2021, https://www.wsj.com/articles/sec-is-investigating-electric-delivery-truck-maker-workhorse-11630517514 (last visited Sept. 13, 2021).

asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

17.     This Court has personal jurisdiction over each of the defendants because each Defendant is either a corporation conducting business and maintaining operations in this district or is an individual, who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Workhorse maintains its principal executive offices in this District; (b) one or more of the Defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein – including the Individual Defendants' primary participation in the wrongful acts – occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

19.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A. Plaintiffs

20.    Plaintiffs David Cohen and Daniel Cohen have been Workhorse shareholders since prior to the start of the Relevant Period, and are currently, and at all relevant times have been, holders of Workhorse securities.  Plaintiffs are both citizens of Georgia.

### B. Nominal Defendant

21.    Nominal Defendant Workhorse is incorporated in Nevada and maintains its principal executive offices at 100 Commerce Drive, Loveland, Ohio 45140.  Workhorse is a technology company engaged in the development and manufacturing of electric delivery vehicles. The Company's shares are listed on NASDAQ under the ticker symbol "WKHS."

### C. Individual Defendants

22.    Defendant Hughes served as the Company's CEO, President, and a director of the Company during the Relevant Period.  In 2020, Hughes was improperly awarded $1,334,750 in compensation while breaching his fiduciary duties owed to the Company.  During the Relevant Period, Hughes sold more than 568,500 shares of his Workhorse common stock for proceeds of over $14 million.  Hughes is named as a defendant in the Securities Class Action.  Upon information and belief, Defendant Hughes is a citizen of Ohio.

23.    Defendant Schrader served as the Company's CFO during the Relevant Period. During the Relevant Period, Schrader sold 15,152 shares of his Workhorse stock for proceeds of over $332,131.  Schrader is named as a defendant in the Securities Class Action.  Defendant Schrader is a citizen of Ohio.

24.    Defendant Robert Willison ("Willison") served as the Company's Chief Operations Officer ("COO") during the Relevant Period.  In 2020, Willison was improperly awarded $626,250

in compensation while breaching his fiduciary duties owed to the Company.  During the Relevant Period, Willison sold 169,920 shares of his Workhorse stock for proceeds of over $4,825,492.  Defendant Willison is a citizen of Ohio.

25.     Defendant Raymond J. Chess ("Chess") has served as a director of the Company since 2013, and Chairman of the Board since 2015.  He is also a member of the Nominating and Corporate Governance Committee, and previously served as Chair of the Nominating and Corporate Governance Committee until 2020.  He was also a member of the Audit Committee during the Relevant Period.  In 2020, Chess received $135,000 in compensation while breaching his fiduciary duties owed to the Company.  During the Relevant Period, Chess sold 83,218 shares of his Workhorse stock for proceeds of over $1,619,991.  Defendant Chess is a citizen of Michigan.

26.     Defendant H. Benjamin Samuels ("Samuels") has served as a director of the Company since 2015.  He is also a member of the Audit and Compensation Committees.  In 2020, Samuels received $114,167 in compensation while breaching his fiduciary duties owed to the Company.  During the Relevant Period, Samuels sold 1,099,994 shares of his Workhorse stock for proceeds of over $24,477,884.  Defendant Samuels is a citizen of Texas.

27.     Defendant Gerald B. Budde ("Budde") has served as a director of the Company since 2015.  He is also Chair of the Audit Committee and was formerly a member of the Nominating and Corporate Governance and Compensation Committees during the Relevant Period.  In 2020, Budde received $114,167 in compensation while breaching his fiduciary duties owed to the Company.  During the Relevant Period, Budde sold 60,000 shares of his Workhorse stock for proceeds of $1,195,800.  Defendant Budde is a citizen of Ohio.

28.     Defendant Harry DeMott ("DeMott") has served as a director of the Company since 2016.  He is also a member of the Nominating and Corporate Governance and Compensation

– 9 –

Committees. In 2020, DeMott received $114,167 in compensation while breaching his fiduciary duties owed to the Company. During the Relevant Period, DeMott sold 116,450 shares of his Workhorse stock for proceeds of $2,742,584. Defendant DeMott is a citizen of Connecticut.

29. Defendant Michael L. Clark ("Clark") has served as a director of the Company since 2018. He is also a member of the Audit Committee and serves as Chair of the Compensation Committee. In 2020, Clark received $114,167 in compensation while breaching his fiduciary duties owed to the Company. Defendant Clark is a citizen of New York.

30. Defendant Jacqueline A. Dedo ("Dedo") has served as a director of the Company since 2020. She is also a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee. In 2020, Dedo received $68,333 in compensation while breaching his fiduciary duties owed to the Company. Defendant Dedo is a citizen of Michigan.

31. Defendant Pamela S. Mader ("Mader") has served as a director of the Company since 2020. She is also a member of the Compensation and Nominating and Corporate Governance Committees. In 2020, Mader received $68,333 in compensation while breaching his fiduciary duties owed to the Company. During the Relevant Period, Mader sold 8,000 shares of her Workhorse stock for proceeds of $240,000. Defendant Mader is a citizen of Indiana.

32. Defendants Hughes, Schrader, Willison, Chess, Samuels, Budde, DeMott, Clark, Dedo, and Mader are, at times, referred to collectively herein as the "Individual Defendants."

33. Defendants Hughes, Chess, Samuels, Budde, DeMott, Clark, Dedo, and Mader are, at times, referred to collectively herein as the "Director Defendants."

34. Defendants Hughes, Schrader, Willison, Chess, Samuels, Budde, DeMott, and Mader are, at times, referred to collectively herein as the "Insider Selling Defendants."

35.     Defendants Chess, Samuels, Budde, Clark, and Dedo are, at times, referred to collectively herein as the "Audit Committee Defendants."

36.     As directors and/or officers of Workhorse, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about Workhorse's business, operational, and compliance policies, prospects, internal controls, and financials because of their access to internal corporate documents, conversations, and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.   The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Workhorse through, *inter alia*, the issuance of the improper statements disseminated to the press, securities analysts, and Workhorse stockholders.

## SUBSTANTIVE ALLEGATIONS

### A.     Workhorse's USPS Next Gen Project Bid

37.     In 2016, USPS announced the Next Gen project, a competitive multiyear acquisition process for replacing approximately 165,000 package delivery vehicles.  The Next Gen contract was thought to be worth approximately $6.3 billion for the company selected to contract with USPS.

38.     Among the companies vying for the Next Gen contract was Workhorse.

39.     The NGDV program included two phases: the Prototype Phase and the Production Phase. Workhorse predecessor AMP Holdings, Inc. submitted a proposal to create a prototype, listing Defendant Hughes as the main point of contact, but the bid was rejected because Workhorse's engineers were unable to use the design software USPS required all bidders to use. This was a very early indication that Workhorse was not equipped to design or produce vehicles

to the standard required for such a large and significant contract. However, instead of dropping out (as several initial bidders did), Defendants engaged in a scheme to futilely pursue the USPS contract in order to raise the price of Workhorse stock, resulting in Workhorse's executives and board members making tens of millions of dollars in insider trading profits.

40.     After failing to present a viable proposal on its own, Workhorse partnered with well-established engineering company VT Hackney, which, along with five other prime contractors, had been selected as manufacturers for award of a prototype contract, and received a share of approximately $37 million to design and build a working mail truck prototype for testing. These six suppliers were contracted to design and manufacture fully functioning NGDV prototypes in accordance with USPS's requirements and objectives, after which USPS would take delivery of the prototypes and test them extensively for six months.

41.     VT Hackney subsequently realized the venture would not be profitable enough to continue and decided to drop out. Instead of bowing out along with their much more experienced partner, on November 6, 2019, Workhorse announced it had purchased VT Hackney's right to bid on the contract for approximately $7 million.

42.     According to the USPS's Solicitation sent to Workhorse and other contract bidders, USPS evaluated the proposals weighing its "total cost of ownership, technical evaluation results, and risk," to determine the "best value" to USPS.  *See* Federal Claims Action (defined below), Complaint at ¶ 34.

43.     "Total Cost of Ownership," included consideration of factors such as "acquisition costs, maintenance costs, fuel costs," etc.  *Id*. at ¶ 35.

44. The "Technical Evaluation Factors" "were (in descending order of importance): Design Quality and Technical Approach, Supplier Capability, and Past Performance, each of which comprised multiple subfactors." *Id*. at ¶ 36.

45. With regard to Design Quality, the most important Technical Evaluation Factor, USPS evaluated the proposals' (i) Reliability, (ii) Maintainability, (iii) Fuel Economy and Emissions, and (iv) Safety and Ergonomics. *Id*. at ¶ 39. Reliability was assessed based on the "clarity, completeness, and merit of the [NGDV's] specific features, materials, assembly techniques, sourcing, and quality control strategies." *Id*. at ¶ 40. Maintainability was assessed based on "[t]he completeness and quality of the offeror's description of how specific design features, materials, assembly and/or operating characteristics will lead to reduced maintenance." *Id*. at ¶ 41. Fuel Economy and Emissions was assessed based on "[t]he completeness of description and projected value of [the] offeror's features that focus on improving fuel economy and reducing emissions." *Id*. at ¶ 42. Safety and Ergonomics was assessed based on "[t]he completeness, feasibility, and potential safety value of [the] offeror's various design features, systems, and components that focus on improving safety of operations and minimizing carrier accidents," including "features that increase the efficiency of loading, unloading, curbside delivery, package delivery and delivery activities." *Id*. at ¶ 43.

46. As for the second most important Technical Evaluation Factor, "Supplier Capability," USPS evaluated (i) Engineering Capability, (ii) Production and Delivery, (iii) Service and Parts, and (iv) Quality. *Id*. at ¶ 44. Engineering Capability was assessed based on "[a]vailable resources, qualified personnel, and facilities for production design, development, and warranty support." *Id*. at ¶ 45. Production and Delivery was assessed based on the "[a]bility to produce NGDVs in accordance with [its] proposed production schedule, including a focus on the offeror's

production facilities and ability to effectively scale into production." *Id*. at ¶ 46. Service and Parts was assessed based on "[p]resent and future capability to provide consistent service support and parts during the NGDV lifecycle." *Id*. at ¶ 47. Quality was assessed based on "[e]xperience with and evidence of [offeror's] quality management system and the quality management system of [their] key partners/subcontractor(s)." *Id*. at ¶ 48.

47. In evaluating the third Technical Evaluation Factor, "Past Performance," the USPS considered "Prototype Performance and Prior Performance, with the former carrying greater importance." *Id*. at ¶ 49. USPS assessed Prototype Performance "as demonstrated by the Postal Service's testing and observations during the NGDV Prototype Phase, including validation of the subsystem reliability, vehicle safety, fuel economy, acceptance testing validation, break-in resistance, cold weather adaptability, and any other relevant performance tests performed by the Postal Service." *Id*. at ¶ 50. Prior Performance was assessed based on the "[e]xtent and quality of offeror and key partners/subcontractor(s)['] past performance in both research/development and design production of vehicles[,]" including performance on prior government and commercial contracts of similar size and scope. *Id*. at ¶ 51.

48. The Solicitation made clear that "the technical evaluation tak[es] priority" and "would be more important than Total Cost of Ownership in ultimately calculating the best value to the USPS." *Id*. at ¶¶ 34, 37. Thus, the Solicitation indicated that USPS would not award a contract based on long-term fuel cost savings at the expense of safety, quality, manufacturing capabilities, and experience. *Id*.

49. In September 2017, the Workhorse/VT Hackney team delivered six vehicles for prototype testing under the NGDV acquisition program in compliance with the terms set forth in

their USPS prototype contract. The prototype vehicles would be tested for emissions and fuel economy, ergonomics, aesthetics, handling, and durability.

50.     Workhorse, however, neither built the prototype itself (it was built by a Detroit company called Prefix) nor was it capable of producing other trucks like the prototype. Key documentation – for example, a description of how the suspension attached to the cab of the truck – was missing. While the prototype could technically fulfill the USPS requirements, certain design deficiencies like the foregoing were precisely the issues USPS was concerned with in evaluating the most important Technical Evaluation factor, the "Reliability" of its "Design Quality."

51.     The prototype submitted by Workhorse experienced numerous critical failures during testing. For example, a report by Fuzzy Panda Research on October 8, 2020, entitled "The 'Brakes' Fall off the USPS Story: Workhorse's USPS Bit has Numerous Critical Failures" (the "Fuzzy Panda Report"), described the following incident in Spring 2018, which Fuzzy Panda attributed to an inside source:

> Workhorse rolled a USPS prototype truck down a hill accidently after their parking brake failed causing a union USPS driver to be hospitalized after jumping out of the runaway vehicle. We think this debacle as well as the numerous other "critical failures" we will lay out, destroyed Workhorse's chances of ever landing the USPS NGDV award.

52.     After the prototype testing phase completed in December 2019, USPS commenced the Production Phase by publishing a Request for Proposals for the production of the NGDV vehicles. All contractors who had completed prototype testing – regardless of the results of that testing – were eligible to submit proposals, which were due on July 14, 2020. At this point, the Prefix prototype had suffered numerous failures during testing, and even if Workhorse had been granted all or part of the USPS contract, it would not have been capable of mass producing the truck designed by Prefix. However, in order to maintain and inflate the price of their stock,

Defendants nonetheless submitted a proposal. The week their proposal was due, Hughes, and several members of Workhorse's board of directors sold large quantities of Workhorse stock at artificially inflated prices.

53.     On March 13, 2020, Workhorse filed its annual report on Form 10-K for fiscal year ended December 31, 2019 (the "2019 10-K"), which was signed by defendants Hughes and Schrader.  Attached to the 2019 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2000 ("SOX") signed by defendants Hughes and Schrader attesting to the accuracy of the financial statements and the disclosure of all fraud.

54.     With regard to Workhorse's involvement with the Next Gen project, the 2019 10-K advised that "Workhorse was one of the five participants" that USPS had selected "to build prototype vehicles," and that Workhorse "delivered six vehicles for prototype testing," which the vehicles "completed" in 2019:

> U.S. Post Office Replenishment Program / Next Generation Delivery Vehicle Project
>
> Workhorse was one of the five participants that the [USPS] selected to build prototype vehicles for the USPS [NGDV] project. The USPS has publicly stated that approximately 165,000 vehicles are to be replaced. In September 2017, Workhorse delivered six vehicles for prototype testing under the NGDV [a]cquisition [p]rogram in compliance with the terms set forth in their USPS prototype contract. In 2019, the vehicles completed the required testing protocol as specified by the USPS.

55.     As part of the bidding process, Workhorse was subject to a nondisclosure agreement with the USPS (the "NDA") which prevented it from sharing any non-public information regarding the contract or the bidding process. Rather than simply not discussing the contract, Hughes announced, in every earnings call from the start of the Relevant Period until the time the winner of the award was announced, that Workhorse was under an NDA and was only

– 16 –

able to provide information which was already in the public domain. This statement suggested to the public that Workhorse was still in the running for the contract.

56. On September 3, 2020, less than two months Workhorse submitted its proposal, USPS Contracting Officer Delores B. Waters sent Workhorse a "Deficiency List" identifying various "weaknesses" in Workhorse's proposal but acknowledged that the list was only representative of the problems, as it "indicated that there were additional, unstated issues." Federal Claims Action, Complaint at ¶ 62. The USPS' Deficiency List required Workhorse to submit a 99-page Deficiency Response, which it sent on September 25, 2020.

57. On October 21, 2020, Ms. Waters sent another email to Workhorse containing yet another list of issues related to Workhorse's cost breakdown and maintenance. The USPS inquiry required Workhorse to again submit a response on October 28, 2020 to attempt to address these issues.

**B. The Individual Defendants' Materially False and Misleading Statements About the Next Gen Project Bid**

58. As part of the bidding process, Workhorse was subject to an NDA with the USPS which prevented the Company from sharing any non-public information regarding the contract or the bidding process. Rather than simply not discussing the contract, Hughes announced, in earnings calls from the start of the Relevant Period until the time the winner of the award was announced, that Workhorse was under an NDA and was only able to provide information which was already in the public domain. These statements suggested to the public that Workhorse was still in the running for the contract.

59. Workhorse executives used the NDA as a shield to protect them from discussing unfavorable information, even if it was only tangentially related to the USPS Contract. For example, during the May 6, 2020 earnings call, an analyst inquired further about the supply chain,

namely, about the ability of Workhorse's suppliers to meet the needs of the USPS NGDV contract, in the event Workhorse to secure all or part of it. Schrader stated that he could not comment because of the USPS NDA. The analyst asked, "[s]o you can't talk about the capabilities of a supply chain to serve the post office? Is that off-limits?" Schrader replied, "I would think it's a similar supply chain that would supply the current trucks that would supply a post office vehicle." In truth, Workhorse's suppliers barely had the capacity to support Workhorse's production at the time, which ended up being less than 20 trucks for the whole year 2020. Defendant Schrader used the USPS NDA to avoid discussing these issues.

60. Moreover, Defendants, particularly Defendant Schrader, repeatedly discussed the reasons Workhorse was purportedly well-positioned to win the contract award (i.e., President Biden's goal to electrify federal vehicles discussed below), while omitting that USPS' evaluation focused on factors related to reliability, manufacturing, safety, and experience that precluded Workhorse from winning the contract, despite the fact that its proposal was all-electric.

61. On July 7, 2020, defendant Schrader participated in an interview with Benzinga, a financial news publication. When asked how Workhorse separates itself from the competition generally (unrelated to the Next Gen project), Schrader responded by explaining why Workhorse trucks were advantageous for "***postal services***," stating, "[Workhorse] trucks don't have a transmission, ***so we can save postal services upward of 60% of vehicle costs***. Our truck will cost fleets 40 cents a mile compared to the current $1 per mile."

62. On July 14, 2020, Workhorse and other participants in the Next Gen project submitted their final bids for the contract.

63. One week later, on July 21, 2020, defendant Schrader spoke with Benzinga once more. According to the article:

– 18 –

> Schrader [] provided an update on the $6 billion U.S. Postal Service contract for its next-generation mail trucks. Workhorse is one of four remaining participants bidding for the contract. Schrader said he can't discuss too much about the process at this point, but ***Workhorse is the only all-electric option***. . . .
>
> In addition, [Schrader] said Workhorse vehicles have half the maintenance costs of the current USPS fleet.

64. Defendant Schrader is also quoted in the July 21, 2020 interview as having stated the following regarding Workhorse's involvement with the Next Gen project:

> "***What I will say is our all-electric is probably the perfect vehicle for [USPS].***
> When you think about what the Post Office does, 70% of their trucks go about 17 to 18 miles a day and make 700 stops – mailbox, mailbox, mailbox. Ours runs more like a golf cart, so that's really what you need. Right now they get five to six miles per gallon. Ours get more than 40 miles per gallon equivalent" . . . .
>
> "I think it's a great opportunity for us. Obviously, if we were to get the full award or a decent-sized award, that would be ***transforming*** for the company[.]"

65. On August 6, 2020, defendant Hughes sat for an interview with the television network, CNBC, during which Hughes stated the following about the USPS contract:

> **CNBC**: What can you tell us about the status of the U.S. Postal Service potential contract? That contract could be worth as much as about five to six billion dollars. You could get a partial award; you could get a full award. You submitted the RFP, I think, mid-July. When will you know? Your CFO recently said that this award would be transformative for the company. I would imagine that would be so, if your cash position right now is about a hundred million; I mean, that contract could be truly changing for your company.
>
> **HUGHES**: Yeah, I would say any contract like that would be ***changing*** for any company, virtually. In our case, we're unable to speak about the Post Office at all. I have to say no comment because we're under a gag order not to talk about it. But certainly, to your point, ***any contract that's worth billions of dollars coming into a company like ours would be a very company-changing experience***.

66. On September 21, 2020, the Company filed its Schedule 14A with the SEC (the "2020 Proxy Statement"). Defendants Hughes, Chess, Budde, Samuels, DeMott, and Clark solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

67.    With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated that it "applies to all of our directors, officers and employees including our [CEO] and [CFO] and principal accounting officer."

68.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

69.    The 2020 Proxy Statement also called for shareholders to approve, among other things: (1) the election of eight directors; (2) the issuance of the maximum number of shares of the Company's common stock issuable in connection with the potential future (i) conversion of the a senior secured convertible note for the principal amount of $70 million issued pursuant of the Securities Purchase Agreement dated June 30, 2020, and (ii) delivery of shares of the Company's common stock in lieu of cash payments of interest and principal on that note (the "Issuance Proposal"); and (iii) the ratification of the Company's independent auditor for the fiscal year ending December 31, 2020.

70.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

71.    The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, inter alia: (i) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle,

and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (ii) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; and (iii) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

72.     On October 11, 2020, Workhorse issued a press release entitled *Workhorse Secures $200 Million Financing from Institutional Lenders*.  The press release explained that the notes would be convertible into common stock at $36.14 per share, a premium of 35% over the closing price of the common stock on Friday, October 9th, subject to certain potential closing adjustments.

73.     On October 29, 2020, Defendant Schrader once again joined Steve Israel ("Israel") of Benzinga for an interview, video of which was embedded in an article on Benzinga's website titled "Workhorse CFO Steve Schrader On The Status Of The USPS Contract, Delivery Guidance, And What Stands In Their Way" and was also posted to Benzinga's YouTube page under the title "USPS, Drones. & Production Outlook | Workhorse CFO Steve Schrader | Benzinga Exclusive." On the same day, the Company posted a link to the YouTube video of the interview on Workforce's Twitter account with the caption "Workhorse CFO Steve Schrader." During the interview, Defendant Schrader and Israel had the following exchange regarding the USPS contract, in relevant part:

> *Israel*: Can you just refresh us on what this deal would mean for Workhorse?
>
> *Hughes*: Well, the Post Office is bidding out 165,000 vehicles, so it's a huge fleet opportunity. And I think, from our standpoint, it would be transforming, right, from a standpoint of, just, now [we're] delivering a few vehicles and getting some revenues in and we have a backlog of about twelve hundred orders. But, you know, the Post Office would be 165,000 vehicles over a certain time period, too. So, it would be transforming. It would be a big opportunity for us.

**Israel**: Do you expect, when they do award the contract, do you expect to be like the only recipient, the only winners, or do you expect to be one of several, or do you have any expectations there?

**Schrader**: I don't think we have expectations one way or the other. It's, again, we can't comment on it. I think it's up to the Post Office and what they want to do and, at least publicly, they've said that they'll let everybody know by the end of the year.

74.     On November 9, 2020, the Company filed with the SEC its quarterly report for the third fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Hughes and Schrader, and contained SOX certifications signed by Defendants Hughes and Schrader attesting to the accuracy of the 3Q20 10-Q.

75.     The 3Q20 10-Q stated the following concerning the Company's internal controls:

There were no changes in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the nine months ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

76.     On January 26, 2021, the Company stated "Thank you President Biden for your continued support for American-made Electric Vehicles. #workhorsegroup" on Workforce's Twitter account.

77.     On January 27, 2021, Defendant Schrader joined Simranpal Singh, the host of a popular YouTube channel which focusses on investing in the stock market. The video of the interview was published on Singh's YouTube page under the title "EXCLUSIVE INTERVIEW WITH WORKHORSE CFO STEVE SCHRADER! USPS CONTRACT UPDATE! | WKHS STOCK." On the same day, the Company posted a link to the YouTube video of the interview on Workforce's Twitter account with the caption "EXCLUSIVE INTERVIEW WITH WORKHORSE CFO STEVE SCHRADER." During the interview, Defendant Schrader stated the following regarding the USPS contract:

It's positive what we're seeing from the administration, you know, President Biden just five days into his presidency has kind of pushed electric vehicles for all government agencies. That's a positive that, you know, not only that I think he pushed it for all-American, he pushed [electric vehicles] for the fleets he pushed all-American and he pushed small business, so I think that we were happy to hear all that. I that that Secretary of Transportation nominee Pete Buttigieg has also talked about spending some money on infrastructure so I think the current administration is very positive about [electric vehicles] and it's a little different from a government standpoint as you usually have the government pushing things that is [sic] not ready for the commercial market, in this case commercial markets there you got interest from the customers on both sides and the investment side so money is going into [electric vehicles] as we can see as well so it's actually the government maybe is lagging behind a little even the states are ahead, California and New York with voucher programs, infrastructure support. It's actually the federal government that has them, but now that the federal government is putting their full force behind it and always helps to get the federal government behind an industry, especially ours.

78. On January 28, 2021, Defendant Schrader joined Jack Spencer, the host of a popular YouTube channel named "Jack Spenser Investing" which concentrates on investing in the public equity markets. The video of the interview was published on Jack Spencer Investing's YouTube page under the title "HUGE WORKHORSE STOCK UPDATES VIA STEVE SCHRADER - WKHS CFO." On the same day, the Company posted a link to the YouTube video of the interview on Workforce's Twitter account with the caption "Steve Schrader talks with Jack Spencer." During the interview, Defendant Schrader and Spencer had the following exchange regarding the USPS contract:

*Spencer*: So, Workhorse has been doing fantastic things as of late, over the last month or so in particular, and there's a few things I really want to speak about today. Now the first one is, Steve, I'd just like to hear your thoughts on Biden saying that the entire federal fleet will be replaced with electric vehicles, specifically American electric vehicles. And I know we can't speak about the USPS contract, even though that's what the entire comment section is probably asking us about, but I'd just like to get your thoughts on his statements and what it could potentially mean for Workhorse going forward.

*Schrader*: Yeah, I think the President's announcement was huge, for several reasons, right? It's, one, supportive of the E.V. ("electric vehicle") market. It's, two, all-American, like you said, all-American product buy. And I think he also

– 23 –

said a lot about small businesses, and purchasing, whether it be parts or final products, from small businesses, too. So, I think that's huge. I think it's meaningful that he did this his fifth day into his presidency, right? He did it quickly; he didn't really wait and so I think that, putting a move on that was very quick too. I think it's also meaningful that, when you think about it, when the government gets behind things, things happen. And in this case, it's, the government actually is maybe somewhat behind the commercial market. As you well know, customers are already demanding these products, right? Investors are already looking at companies that are making these products, so I think everybody sees that E.V.s are kind of the way of the future going forward, and they see – customers see – the savings opportunities and I think what probably has, the only thing that has been missing, to some extent, is that now you've got the government behind it, from a standpoint of environmental, you know, and just – savings opportunities going forward. So, yeah, having the government push us and the President come out, like I said, five days after his inauguration, is huge.

*Spencer*: It was nice and quick. And as you just said, I think that's exactly what we wanted to see. I mean, we've spoken a few times now and you've made it very evident that a lot of the people who actually want to buy these trucks – I think every fleet manager in the country at this stage is now heavily contemplating E.V. more so than traditional[] vehicles, from a savings point of view. I think the government to an extent were a little bit behind, so they're seeing something like this come from the President himself, that has to be a huge catalyst to pretty much everybody involved, especially the all-American owned ones, which we know you guys stand very heavily for. So that's awesome; that's just awesome. And that, obviously, it's a very good thing.

*Schrader*: Yes. It's a very good thing . . .

79.     Schrader also told one interviewer that Workhorse would be adding a "government division" to its business portfolio.  As a result of these positive statements, Workhorse stock continued to climb, closing at $34.32 per share on January 29, 2021 – an increase of over $10.00 per share in a one-week time period.

### C.     The Individual Defendants' Statements About the Next Gen Project Bid Were False and Misleading

80.     The statements identified above in ¶¶37-79 made or caused to be made by the Individual Defendants, were materially false and/or misleading because they misrepresented and failed to disclose material, adverse facts concerning the Company's business, operational, and

compliance policies, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made, or caused to be made, false and/or misleading statements and/or failed to disclose that: (i) Workhorse was merely hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (ii) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; (iii) the Company failed to maintain internal controls; and (iv) as a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times. Through their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period.

### D. The Truth Is Revealed About Workhorse's Failed USPS Bid

81. First, on October 8, 2020, Fuzzy Panda Research published a report prior to the opening of the market, entitled "The 'Brakes' Fall Off The USPS Story: Workhorse's USPS Bid has Numerous Critical Failures." The report revealed numerous true, non-public facts, that contradicted Defendants' statements, and partially revealed Defendants' scheme. For example, Fuzzy Panda revealed, through its own non-public conversations with sources, that Workhorse's initial partner to the NGDV bid, VT Hackney, dropped out and sold their rights to Workhorse because of, among other things, "Numerous Critical Failures" during the prototype testing, including motors breaking, safety belt problems, constant door problems, problems with the performance of the chassis, suspension problems, range problems, power problems, and "most notably," the "notorious parking brake failure resulting in a USPS employee being hospitalized." Fuzzy Panda revealed based on its own investigator's visits to Workhorse facilities that employees

were not working on producing vehicles as the Company represented, and could not manufacture vehicles at scale.

82. Although initially refusing to comment on the Fuzzy Panda Report, Workhorse later corroborated Fuzzy Panda's description of the critical failures discovered during testing. Workhorse's Federal Claims Action Complaint against USPS, filed on June 16, 2021, revealed to the public for the first time the myriad reasons why USPS rejected Workhorse's bid. The "posterchild" reason, which is remarkably similar to the story provided to Fuzzy Panda Research by its "inside source," was an incident where "a flaw in Workhorse's parking brake system caused Workhorse's prototype vehicle to roll down an incline and into a ditch, injuring a test track driver." Federal Claims Action, Complaint at ¶ 11. The "roll-away" incident negatively impacted both the "Design Quality" and "Past Performance" evaluation factors in the USPS review, which both involved safety performance.

83. Additionally, Fuzzy Panda revealed the fictitious nature of the purported "backlog" of UPS orders, and that all the vehicles Workhorse had produced for them were simply prototypes. Finally, the Report revealed that Workhorse had a history of connections to illegally paid stock promoters who were hired to "publish dozens of bullish articles on its clients, which appeared to be independent research pieces."

84. While the Fuzzy Panda Report's revelations had an immediate negative impact on Workhorse's stock, the Company's stock price bounced back as news and media outlets discounted the report as influenced by Fuzzy Panda's short position. For example, Bloomberg published an article that same day, entitled "Workhorse Shares Shrug Off Short-Seller Report's Allegations," reporting on the Fuzzy Panda piece, attributing a sharp price decline in Workhorse's stock to the

revelations in the report, stating "[s]hares of Workhorse declined 1.2% to $23.91 at 1:08 p.m. in New York after paring an earlier decline of as much as 6.1%."

85.     On February 23, 2021, while the market was open, the USPS issued a press release entitled: U.S. Postal Service Awards Contract to Launch Multi-Billion-Dollar Modernization of Postal Delivery Vehicle Fleet.   The press release announced that Oshkosh Defense – not Workhorse – had won the lucrative NGDV contract in its entirety.

> WASHINGTON, DC — The U.S. Postal Service announced today it awarded a 10-year contract to Oshkosh, WI, based Oshkosh Defense, to manufacture a new generation of U.S.-built postal delivery vehicles that will drive the most dramatic modernization of the USPS fleet in three decades.

86.     On this news, securities of Workhorse fell $14.87 per share, or 47%, to close at $16.47 in the regular session on February 23, 2021.  The price continued to drop in after-hours trading and opened on February 24, 2021 at a price of $14.07, a fall of over 50% from the previous open, damaging investors.

87.     The New York Times published an article on February 24, 2021 entitled *Losing Bid for Postal Contract Proves Costly for Electric-Vehicle Maker*.  The subtitle read: "Workhorse, a small truck maker with big ambitions, was counting on the deal for a surge in revenue.  Its shares lost $2 billion in value."  The article stated, in pertinent part:

> The choice of Oshkosh left open the possibility of some electrification. The new vehicles will be equipped with either fuel-efficient gasoline engines or electric batteries, and they will be retrofitted to keep pace with advances in electric-vehicle technology, the Postal Service said.

> But that rollout could be limited. In response to questioning at a House Oversight and Reform Committee hearing on Wednesday, the postmaster general, Louis DeJoy, said the agency's plan called for 10 percent of its new trucks to be electric.

> Asked by Representative Jackie Speier, a California Democrat, why that figure was not 90 percent, Mr. DeJoy pointed to cost.

– 27 –

"We don't have the three or four extra billion dollars in our plan right now that it would take to do it," said Mr. DeJoy[.]

88.     Also, on February 24, 2021, Workhorse published a press release (not filed on SEC Form 8-K, despite the clear materiality of the subject matter) titled "Workhorse Provides Corporate Update." The press release stated:

> On February 23, 2021 the USPS issued a press release announcing that it has made an award under the NGDV contract to a competing finalist, . . . After being informed of the USPS decision, the Company has requested, pursuant to the bid process rules, additional information from the USPS and is awaiting a response at this time. ***The Company intends to explore all avenues that are available to non-awarded finalists in a government bidding process***.

89.     The very next day, on February 25, 2021, Workhorse granted massive stock awards to the Individual Defendants, other executives, and the Workhorse Board members. The purported value of this stock was $15.13 per share, the closing price on February 24, 2021.

90.     On March 3, 2021, Workhorse met with representatives of the USPS, purportedly to request further information about why that Workhorse's proposal was rejected. In the meeting, Workhorse representatives were told that their prototype was rated less favorably than Oshkosh's vehicle on the Technical Evaluation Factors. However, rather than revealing this simple and understandable explanation to investors, Defendants continued to use the NDA as a convenient vehicle for flouting securities laws, repeatedly stating they could not reveal what happened in the March 3, 2021 meeting with the USPS, but: "[w]e are continuing to evaluate our options and intend to continue to explore all avenues that are available to us."

91.     According to Workhorse's Federal Claims Action Complaint, shortly after the March 3, 2021 debriefing, Workhorse submitted a "'disagreement to the USPS in accordance with 39 CFR § 601.107." Federal Claims Action, Complaint at ¶ 75.

92.     Several days later, on March 22, 2021, USPS responded to Workhorse's "disagreement" with a strongly worded letter, which Workhorse characterized as a "lengthy screed aggressively attacking Workhorse. . . . " *Id*. at ¶ 76.  In addition to pointing out the "'critical' deficiencies in Workhorse's proposal," some of which had already been specifically raised to Workhorse, the USPS clarified that Workhorse was ranked last among the competing proposals in Technical Ranking, the most important part of the USPS valuation.  *Id*. at ¶¶ 77, 81.  In fact, the Technical Score (although conveniently redacted from Workhorse's Complaint) was so low that it caused Workhorse to also rank last in Best Value Ranking, despite ranking second in Total Cost of Ownership.  *Id*. at ¶ 81.

93.     Although heavily redacted, Workhorse's Federal Claims Action Complaint indicates the USPS identified "major" and "significant weaknesses" in Workhorse's Design Quality and Technical Approach, the most important analysis in the Technical Evaluation Factors, and "faulted Workhorse multiple times" for the "rollaway accident" attributable to a defective parking brake design.  *Id*. at ¶¶ 101-109.  While Workhorse complains that "double-counting" this negative incident against the Company was unfair, clearly the incident affected multiple different categories of evaluation including Reliability, Safety, and Prototype Performance.  *Id*. at ¶¶ 136.  Among the many subcategories evaluated during the process, the USPS identified deficiencies in Reliability, Maintainability, Safety & Ergonomics, Supplier Capability, Production & Delivery, Service & Parts, Quality, Past Performance, Prototype Performance, and Prior Performance.  *Id*. at ¶¶ 101-145.  In addition to safety and quality concerns, the USPS was clearly concerned with Workhorse's "scale-up capability to deliver the vehicles on schedule," as its "analysis of Workhorse's Production & Delivery capabilities [was] devoid of any mention of Workhorse's manufacturing plant in Union City, Indiana," and its picnic table production line, and instead

"focused on Workhorse's partnership," which it also found inadequate to perform the contract. *Id*. at ¶ 123. The USPS also criticized Workhorse's lack of experience, ignoring Workhorse's touted "purchase orders" with "blue-chip customers," and highlighting that Workhorse had "buil[t] fewer than 1,000 vehicles." *Id*. at ¶ 144. By Workhorse's own characterization, the USPS considered "Workhorse as a 'startup' company without the experience or capability to produce the NGDV." *Id*. at ¶ 185.

94. The USPS also stated that Workhorse displayed a "lack of credibility with the Federal government," and "castigated Workhorse" for their public statements regarding the NGDV program. *Id*. at ¶¶ 88-89. In fact, the USPS, who had reviewed Workhorse's proposal, tested its prototype, and conferred with Workhorse regarding deficiencies in its proposal – all non-public information not available to investors – accused Workhorse with not only violating the NDA with respect to Defendants' public statements, but also cited the USPS's support of *that very litigation* as a reason that it could have rejected Workhorse's proposal "even if the USPS had rated its proposal the best value." *Id*. at ¶ 89.

95. Then, on May 10, 2021, when, despite continuously emphasizing the Company's plans to "ramp-up" production, Defendants revealed Workhorse had only delivered 6 trucks in the First Quarter of Fiscal 2021 ("1Q:21") and had only produced 38 trucks total year to date, making it clear that Workhorse simply did not have the capability to manufacture vehicles at any scale, that the Company's supposed manufacturing ramp-up remained "elusive," that there was not path to achieving the Company's stated target of 1,800 trucks in 2021. Once again, Workhorse stock fell precipitously when the truth was revealed, falling to $8.20 at close on May 10, 2021, a 15% decrease from the prior trading day close of $9.64.

96.     On June 16, 2021, Workhorse filed a complaint with the United States Federal Court of Claims protesting the award of the NGDV contract to Oshkosh.[3]  The Federal Claims Action confirmed that USPS had decided early in the NGDV Program that Workhorse would not be the awardee based on a variety of factors, including: (i) The prototype submitted by Workhorse suffered numerous critical issues during testing, including an incident where the parking brake on the prototype failed, sending the USPS test driver to the hospital; (ii) the USPS was concerned that Workhorse was "a 'startup' company without the experience or capability to produce the NGDV"; (iii) the USPS had identified numerous "critical" deficiencies in Workhorse's proposal, including missing information about the warranty on various parts and an "unacceptable" service plan; and (iv) after testing, Workhorse's proposal ranked dead last in both its Technical Ranking and its Best Value Ranking, while Oshkosh's vehicle was ranked first in both the technical evaluation and total cost of ownership evaluation, making Workhorse the clear and logical loser and Oshkosh the winner of the bid.

97.     Additionally, Workhorse admitted to being told by USPS in September 2020 that its proposal had numerous deficiencies, many of which (including the "roll-away incident," the fact that the Company has never mass produced trucks, and the fact that it did not (and does not have the capacity to do so) were self-evident.  Defendants knew or should have known that, given the priority USPS placed on safety, design and manufacturing capabilities, these deficiencies would have disqualified Workhorse from winning the bid.

98.     With this backdrop, it comes as no surprise that, after not selling shares for months following the USPS NGDV Contract grant to Oshkosh, Defendants Hughes and Schrader suddenly

---

[3] *Workhorse Group Inc. v. United States*, No. 1:21-cv-01484, United States Court of Federal Claims (the "Federal Claims Action").

sold shares on July 1, 2021, just days after the Reddit community targeted Workhorse and surged the Company's stock price.[4]

99.     Confirming suspicions that not all was right with Workhorse, the Wall Street Journal published an article on September 1, 2021 entitled "SEC Is Investigating Electric Delivery-Truck Maker Workhorse," revealing that the SEC disclosed in a letter denying a public records request that its enforcement division has been probing Workhorse.[5]  In reaction to news breaking about the SEC investigation, Workhorse shares fell 6.8% to $9.14.

### E.     Workhorse's Purported 'Backlog' of Vehicle Orders

100.     On May 30, 2018, Workhorse announced via 8-K that it had entered into an agreement with United Parcel Service, Inc. ("UPS") for 1,000 all-electric package delivery vehicles (the "UPS Agreement").

101.     The UPS Agreement, which was attached to Workhorse's May 30, 2018 8-K, provided for delivery of the vehicles in two phases. In phase 1, Workhorse would provide UPS with 50 prototype vehicles as a test fleet, which would be tested across multiple geographic regions for durability.  In phase 2, UPS would take delivery of the remaining 950 vehicles.

102.     The UPS Agreement stated:

(a) Phase 2 "will be *on a timeframe decided by [b]uyer at [b]uyer's sole discretion.*"
(b) "Buyer will determine, at its sole discretion, the level of success of the 50 [v]ehicle test."
(c) "Buyer may reduce the quantity of the balance of the [o]rder (*or cancel the balance of the [o]rder*) depending on the level of success achieved during the phase 1 testing, as determined in [b]uyer's sole discretion."

103.     Defendant Hughes, who was COO of the Company at the time, signed the UPS Agreement on behalf of Workhorse, so he was intimately familiar with the details of the deal.

---

[4] *See* "Workhorse Jumps As Reddit Gang is Talking About it Again," Yahoo Finance, June 29, 2021 (https://finance.yahoo.com/news/workhorse-jumps-reddit-gangtalking-093509708.html).

[5] *See* note 2, *supra*.

104. While it appears UPS took delivery of the 50 prototype vehicles, to date UPS has not requested delivery of the remaining 950 vehicles. In fact, in its 2019 Sustainability Report, UPS announced it had placed an order for 10,000 EVs from "U.K.-based startup Arrival." Workhorse was not mentioned in the sustainability report at all.[6]

105. Despite the lack of assurance that UPS would ever take delivery of these vehicles, from May 2018 onward Defendants used the 950 number to inflate Workhorse's purported "backlog." During the Relevant Period, Defendants repeatedly represented to investors that the UPS order was on the precipice of being fulfilled, for example:

- May 6, 2020 earnings call, Schrader states: "[W]e have the backlog out there in the first place with UPS . . . we're seeing customers very positive about our trucks, and it's more, how soon can we get them.

- August 10, 2020 earnings call, in response to a question about the UPS order, Hughes states: "We are continuing to make sure that the trucks that we do deliver to UPS knock it out of the park, if you will. So rather than having the first few vehicles go to them, *we're working with their implementation schedule across the different depots where they're going to place these vehicles,* starting in the California marketplace as we understand it today."

- October 15, 2020 interview on TD Ameritrade Live, Schrader states: "From our standpoint, we have a backlog of sale orders for UPS and DHL right now. We're talking to a lot of other parties that are looking to order as well, and we expect more this year . . . ." "We have a backlog of approximate 1100-1200 vehicles right now, and

---

[6] UPS 2019 Sustainability Report, available at https://sustainability.ups.com/media/2019-progress-report.pdf.

that represents about a $70 million revenue stream.  To the extent that we manufacture and deliver those, that $70 million will be coming forward probably sometime in the next 12 months."

- November 9, 2020 earnings call, Hughes states: "UPS remains our premier customer, if you will, because they have been [] along with us for the longest time, they collaborated with us on this C-Series design . . . So *we feel strong.  We are happy where we are with UPS.  We will be delivering new vehicles*.  And the real key for them is us deliver us a high-quality vehicle over and over again, right?. . . So the first vehicle we deliver them, we want to hit it out of the park, and we want to make sure it's right."

- March 1, 2021 earnings call, Hughes states: "UPS, it's a combination, obviously, we haven't got production now, but also is when and where UPS would love to take their vehicles first.  They have a depot in California and San Diego that's already with infrastructure.  They love to get the voucher program too.  So ideally, I think their first trucks would ideally go to California."

106.    Including the UPS order in its purported backlog allowed the small startup, which had only previously produced a handful of prototype trucks, to appear legitimate and stable.

107.    The UPS order was not the only suspicious order in Workhorse's purported backlog.  On July 23, 2020, Workhorse published a press release (not filed on SEC Form 8-K, despite the materiality of the announcement) stating that it had secured an order of 20 trucks from a new electronic vehicle start-up, eTrucks.  In the press release Hughes stated "Bill [Hamilton, Managing Partner of eTrucks] and his partner Brian Carr are building a valuable sales and

distribution platform for an underserved market. The SMB fleet operator represents a major opportunity for additional sales."

108. The eTrucks website, https://etrucks.webflow.io/, is registered to a British Indian Ocean Territory domain. The website does not contain a business address, headquarters, information on the history of the company, or any links other than a generic "contact us" form. Instead, it appears to be a promotional site advertising Workhorse trucks, with banners advertising "Drive a Workhorse truck!" eTrucks has no other online presence.

109. To date, eTrucks has not taken delivery of or paid for the 20 trucks mentioned in the July 23, 2020 press release.

110. Based on these facts, it appears that the entity eTrucks was created solely for the purpose of placing an order of Workhorse trucks, making it appear the backlog was larger and customer base was broader than in reality.

111. On November 9, 2020, Defendants announced via a press release (not filed on SEC Form 8-K, despite the materiality of the announcement) that it had received a new purchase order of 500 trucks from Pritchard Companies. In the press release, Hughes is quoted as saying "[w]ith this significant order and agreement from Pritchard, we can build upon our nationwide distribution network and expand the number of potential fleet customers that will be able to operate and own a Workhorse delivery truck." The press release did not indicate when or where Pritchard would take delivery of or pay for the trucks.

112. To this day, it is unclear how many of the 500 vehicles have already been sold to end customers, how many Pritchard intends to take delivery of in 2021, or whether Pritchard has experienced any user demand at all for the Workhorse trucks. When asked about this in the May 10, 2021 earnings call, Schrader simply stated, "[s]o I don't think they want us to announce exactly

kind of what they are doing with their customers and how they are approaching or how they are going to deliver them."

113.    On January 4, 2021, Workhorse published a press release (not filed with the SEC on Form 8-K, despite the materiality of the announcement) announcing that it had "received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises." The press release warned that the order was subject to various production and delivery conditions, but also contained an upbeat statement from Hughes: "Our new agreement with [Pride Group Enterprises] marks our largest individual order to-date and expands our sales channel internationally into Canada for the first time. . . .  This large order solidifies our first-mover advantage and indicates the heightened interest in our last mile delivery products."

114.    Pride Group Enterprises did not create its own press release regarding the acquisition of the trucks, nor did it post Workhorse's press release on its website.  In fact, Workhorse is not mentioned anywhere on Pride Group Enterprises' website.  Pride Group Enterprises' sales website, PrideTruckSales.com, only shows heavy trucks and transport trailers, and there is no information about how one could acquire a Workhorse last-mile delivery truck. These facts indicate that, similar to the UPS contract, there is no assurance Pride Group Enterprises will take delivery of the full order of 6,000+ trucks.

115.    Workhorse currently claims its backlog is approximately 8,000 trucks, however, in truth, all the orders that make up Workhorse's backlog are highly conditional, cancellable, and, in some cases, dependent on non-existent customer demand.

**F.     Workhorse Never Had the Ability to Manufacture Vehicles at Scale, Just Like Its Sister Company, Lordstown Motors, Inc.**

116.    In February 2019, Steve Burns ("Burns") resigned from Workhorse and Hughes was promoted from COO to CEO.  A few months later, Burns went on to found Lordstown Motors

Corporation ("Lordstown"). On November 7, 2019, Workhorse announced an intellectual property licensing agreement under which Workhorse granted Lordstown an intellectual property license related the W-15, an electric pickup truck, in exchange for a 10% non-dilutive equity stake in the company. Workhorse was also entitled to a license fee equal to 1% of the gross sales on the first 200,000 trucks sold. Workhorse included a note describing this agreement with Lordstown in each of its earnings releases during the Relevant Period and often discussed the agreement in earnings calls.

117. As the number of purported pre-orders increased, Lordstown announced that they had entered into a definitive merger agreement with DiamondPeak, through which the combined company would be listed on the NASDAQ stock exchange under the new ticker symbol "RIDE." According to an article in The New York Times, DiamondPeak was a special purpose acquisition company ("SPAC") created by David Hamamoto, a former Goldman Sachs executive who had raised $250 million from big Wall Street investors, which he would have had to return if he could not find a company to merge with.[7] The article states Mr. Hamamoto conducted very little due diligence on Lordstown or Steve Burns, and "the deal came together in weeks." Workhorse maintained its 10% stake in Lordstown, which, after the merger, Workhorse claimed was valued at nearly $285 million. In an earnings call on March 1, 2021, Hughes reported that the stake in LMC was valued at $330 million as of December 31, 2020.

118. However, the Lordstown scheme was exposed, and is now considered one of the "biggest electric vehicle scams in history."[8] Burns resigned from Lordstown on June 14, 2021,

---

[7] See Matthew Goldstein & Emily Flitter, New York Times, *Behind the Lordstown Debacle, the Hand of a Wall Street Dealmaker* (July 13, 2021), available at https://www.nytimes.com/2021/07/13/business/lordstown-motors-dealmaker.html.

[8] See Nickie Louise, Tech Startups, *The Biggest Electric Vehicle Scam in History: Lordstown Motors, an EV startup once valued at $5.3 billion, is now under SEC investigation for an alleged*

after admitting that the pre-sales were fraudulent and Lordstown did not have enough money to begin producing the Endurance.[9]

119.    Lordstown is now being investigated by both the Justice Department and the SEC with regards to the DiamondPeak merger and the fictitious pre-sales of the Endurance.[10]  A class action securities lawsuit is also pending against Lordstown, Burns, and other Lordstown executives in the Northern District of Ohio.[11]  Lordstown has yet to produce a single non-prototype truck.

120.    Just as Lordstown did not have the capacity to mass produce the Endurance, Workhorse did not, and does not currently, have the capacity to mass produce delivery trucks.

121.    The Fuzzy Panda Report revealed that Fuzzy Panda had sent investigators to the Union City facility and Workhorse's Loveland, Ohio headquarters several times during the month of September, 2020.  The investors corroborated the statements made by the confidential witnesses in this case.  There was no automation: "[a]ll production at the facility still occurs ***MANUALLY*** without a sophisticated assembly line or any automation in place."  Workhorse employees invited the investigators into "both Union City Assembly Plant and the 'secure' area of their Loveland

---

*100,000 in fake preorders and zero car delivery* (May 8, 2021), available at https://techstartups.com/2021/05/08/biggest-electric-vehicle-scam-history-lordstown-motors-ev-startup-valued-5-3-billion-now-sec-investigation-alleged-100000-fake-preorders-zero-car-delivery/.

[9] *See* Matthew Goldstein, Lauren Hirsch & Neal E. Boudette, New York Times, *Lordstown, Truck Maker That Can't Afford to Make Trucks, Is on the Brink* (June 14, 2021), available at https://www.nytimes.com/2021/06/14/business/lordstown-motors-steve-burns-juliorodriguez.html.

[10] *See* Ben Foldy & Rebecca Davis O'Brien, The Wall Street Journal*, Justice Department Is Probing Lordstown Motors* (July 2, 2021), available at https://www.wsj.com/articles/justice-department-is-probing-lordstown-motors-11625239730; Ben Foldy, The Wall Street Journal, *Lordstown Motors Discloses Justice Department Investigation as Truck Launch Looms* (July 16, 2021), available at https://www.wsj.com/articles/electric-truck-startuplordstown-motors-discloses-justice-department-investigation-11626443066.

[11] *See Rico v. Lordstown Motors Corp., et al.*, Case No. 4:21-cv-00616 (N.D. Ohio Mar. 18, 2021).

R&D facility," and even let them take photographs of an old engine – which Fuzzy Panda points out was predominantly assembled from Chinese parts, not all-American as Workhorse often claimed.

122.    The Fuzzy Panda investigators also had the following conversations with Workhorse employees:

> ### Union City, Indiana–September 2020 Investigator invited inside Assembly Line Plant
>
> Investigator: **Are those trucks for a particular customer**?
> Employee: **No, those are just <u>show units[.]</u>**
> Investigator: What does that mean like **they are prototypes**?
> Employee: Yeah, they're not production[.]
> Investigator: **Are <u>you making any production units for customers right now</u>?**
> Employee: <u>**No, not right now[.]**</u>
> Investigator: **Is this the only facility where you make units or if there's another one on site?**
> Employee: <u>**No, this is the only production line**</u>
> Investigator: How many of them they do make in a week or a month?
> Employee: <u>**These are just the show units so they're not really doing that[.]**</u>
>
> ### Loveland, Ohio – September 2020 Investigator Conversation within R&D facility:
>
> Employee: … <u>**really most of the production line is in Union City**</u>.
> Investigator: **Is it manual or automated**? Here looks like everything is manual?
> Employee: **Here** [Loveland] **it's all manual, but there** [Union City] **it's all in a production line**.
> Investigator: **So there's automation there**?
> Employee: <u>**No, it's still manual,**</u> **but it's more of a process there**, here is more R&D.

Fuzzy Panda Report at 12 (emphasis in original).

123.    An April 8, 2020 video published on Workhorse's YouTube channel, in which Schrader touts the efficacy of Workhorse's safety practices during the COVID-19 pandemic,

further corroborates the fact that there was no automation at the Union City facility.[12]  In the video, a handful of workers are shown assembling pieces of electric motors on simple wooden benches:



---

[12] *See* https://www.youtube.com/watch?v=Efdt5kZL86E.







The confidential witnesses in this case and the investigators from Fuzzy Panda Research make clear that the wooden benches in the empty warehouse shown in this video are the full extent of Workhorse's production capability.

124.    Despite the lack of automation, assembly lines, and proper staffing, From March 2020 through the end of October, 2020 Workhorse maintained guidance that it could produce 300-400 trucks by the end of the fourth quarter, 2020.

125.    The Individual Defendants repeatedly assured investors Workhorse was on the precipice of ramping up production, and that soon the Union City facility would be capable of producing 5 trucks per day, 10 trucks per day, 100 trucks per month, and so on.

126.    Defendants first set a production target of 300-400 trucks in a press release on March 10, 2020. Hughes reiterated this number during an earnings call on the same day, stating, "[o]ur intent is to produce and deliver a limited number of vehicles to our customers in the second

quarter and then move to higher volumes and deliveries with a target of delivering roughly 300 to 400 delivery trucks in 2020."

127.    Schrader further elaborated on this statement, saying "[Y]ou have to kind of ramp it up slowly.  So I think you expect the first quarter and the second quarter will be a lot smaller quantities and it will be back-loaded towards the fourth quarter in the 300 to 400."

128.    In every earnings call and media interview over the next seven months, Defendants affirmed the 300-400 vehicle target. For example:

- On an earnings call on May 6, 2020, noting challenges imposed by the COVID-19 pandemic, an analyst stated: "I was impressed that you maintained your guide of 300 to 400 units this.  Other EV truck companies are saying that, customers don't have the right number of people in the office, . . .You guys are very straightforward, 300 to 400 was your original guidance, you're reiterating."  Hughes replied: "*[W]e can reiterate our guidance and we can meet what we're saying we're going to do*."

- In an interview with Benzinga on July 24, 2020, Schrader stated: "We are actually making, um, actually making trucks right now at our Union City, Indiana plant, um, and, uh, and we plan to make 300-400 this year."

- A press release published by Workhorse on August 10, 2020 states that the Company "[r]eaffirmed previous production and delivery target of 300-400 vehicles in 2020."

- In an earnings call on August 10, 2020, Schrader stated "the vast majority of our 300 to 400 vehicle production target would be manufactured and delivered by the end of the fourth quarter of this year" and Hughes stated that the Company was developing an assembly plan in order to "deliver our target vehicle production of 300 to 400 units later with a vast majority coming in the fourth quarter."

- In an August 14, 2020 interview with Jack Spencer, Schrader stated: "We've got a prototype started on that, so it's not only just engineering and production right now, ***how to get to kind of our three to four hundred this year, uh, in the fourth quarter***, but also thinking about what we're going to do next."

- On October 15, 2020, in an interview on TD Ameritrade Live, Schrader stated: "Right now we've delivered, you know, a handful of vehicles out there but ***we have a plan to build and manufacture and deliver 300-400 this year***, and most of those will come in this quarter right now, and then continue that to maybe 200 a month or so next year."

- In an October 29, 2020 interview with Benzinga, Schrader stated: "We've got everything in place right now.  So we got the waiver, the materials are coming in, and from our standpoint, ***we still have the 300-400 that we have out there, and that's our goal***."

129.     The Securities Class Action Amended Complaint described Analysts covering Workhorse seized on the 300-400 truck production target, citing the target as a factor in their valuations:

- In a March 10, 2020 note, an analyst from BTIG stated: "Management provided a ***2020 vehicle production guidance target of 300-400 units*** with initial customer deliveries expected to commence in April. . . . the company has now transitioned to the C-Series line and is geared (production line and staffed) up for initial production."
- In a March 10, 2020 note, an analyst from Cowen Equity Research stated: "Workhorse ***looks to deliver between 300 and 400 C-Series vehicles in 2020***. . . . We now expect production to ramp up to ~300 in 1Q21, which should drive gross margin to positive levels… Given that outlook we see the potential for profitability in late 2H21."
- On May 6, 2020, an analyst from Cowen Equity Research stated: "Workhorse has thus far successfully managed through the COVID-19 pandemic. . . . Production has resumed in April and the company has staffing to produce 2 trucks per day and ***continues to target 300-400 for the year***."
- In a May 7, 2020 note, an analyst from Roth Capital Partners wrote: "Workhorse is making strong progress towards production of its C-650 and C-

1000 all electric trucks. . . . Mgmt maintained guidance for 300-400 units delivered in 2020, based on a healthy backlog and customers waiting for vehicle delivery."

- On May 28, 2020, an analyst from Dougherty and Company wrote that, based on discussions with Workhorse management, it was projecting 340 vehicles would be produced in 2020, "in-line with the company's outlook for 300-400 vehicles." In a note published on June 3, 2020, an analyst from Roth Capital Partners stated: "We hosted Workhorse CEO [Hughes] and CFO [Schrader] for a day of virtual investor meetings that reaffirmed our bullish investment thesis. We continue to expect a start to C-1000 electric truck production by the end of 2Q20 with a significant ramp in volumes into the end of the year."

- On June 25, 2020, an analyst from Colliers International wrote: "Yesterday, we hosted investor calls with the management of WKHS, including CEO [Hughes] and CFO [Schrader]. . . . *The outlook for 300-400 units this year was reiterated multiple times.*"

- The same day, June 25, 2020, an analyst from Roth Capital Partners stated: "We met with [Workhorse] CFO [Schrader] and COO Robert [Willison] for investor meetings at the ROTH Virtual London Conference and came away excited about the long-term growth potential. Initial deliveries of the updated C-1000 truck are on track for 2Q20, with *good visibility on a steep ramp into year-end*."

- On August 10, 2020, the day of the Q220 earnings call, an analyst from BTIG gave Workhorse stock a target price of $26/share, stating: "[Workhorse] *reaffirmed its 300-400 unit production target for 2020* (management expects to get to a 100 unit/month run-rate in 4Q20)."

- On the same day, an analyst from Colliers International wrote: "*The outlook for the shipment of 300-400 units in 2020 was maintained*. . . . the significant ramp-up expectations for the second half were unchanged."

- Cowen Equity Research published a note on this same day, stating: "The 2H ramp remains on track and management *continues to target 300-400 vehicles by the end of the year*. After a tough few quarters, we see greener pastures ahead."

- The next day, August 11, 2020, an analyst from Roth Capital Partners stated: "Workhorse's 2Q20 update affirmed the company is on a path for ramping production in 2H20, and mgmt reiterated it expects to produce 100 trucks per month before the end of the year. *The 2020 deliveries guide remains 300-400 units*."

- On September 11, 2020, Colliers International published a note which stated: "The management team of [Workhorse] participated in the Colliers 2020 Investor Conference on 9/10. . . . *There was no change to the outlook for delivering 300-400 units this year*."

- On October 13, 2020, an analyst from Colliers International wrote: "*[Workhorse] plans to produce 300 vehicles in Q4*, and substantially more after that."

- And on November 4, 2020, an analyst from Colliers International wrote a report in anticipation of Workhorse's Q320 guidance, noting that "[i]nvestors will be

> eager to hear [Workhorse]'s progress on ramping-up production during Q4, to meet its 300-400 unit guidance for the year."

Securities Class Action, ECF No. 64 (the "Securities Class Action Amended Complaint").

130.    On November 9, 2020, Defendants revealed that Workhorse would not be making 300-400 trucks in 2020, in fact, it had only produced 7 trucks in the whole third quarter of 2020. Instead of admitting that the company had never had the capacity to make 300-400 trucks in two months, Defendants blamed the delay on supplier constraints and employee absences due to COVID-19.  However, Schrader assured analysts that Workhorse would be ***"getting to 100 trucks per month by the - no little later than the first quarter of 2021** and then getting to **200 trucks a month by no later than the second quarter of 2021***." Based on Defendants' assurances that the delays were only temporary, as well as the prospect of the USPS announcing an awardee in the first quarter of 2021, the stock price began to steadily rise.

131.    Moreover, in the earnings call on November 9, 2020, Defendants doubled down on their scheme, setting a new production target of 1,800 trucks in 2021.  Hughes stated: "we would anticipate producing 1,800 units in 2021" and Schrader elaborated: "I think if you [could] look at it as getting to 100 trucks per month by the - no later than the first quarter of 2021 and then getting to 200 trucks a month by no later than the second quarter of 2021."  However, Defendants did not disclose any plans to spend any further capital on automating the Union City facility.

132.    A few days later, on November 14, 2020, Schrader revealed to Jack Spencer Workhorse's production plan: "you start one a day then two a day and hopefully we'd ramp up to eight a day or so toward the end."  Defendants reiterated the 1,800 truck target multiple times, for example:

- On January 27, 2021, in an interview with Simranpal Singh, Schrader stated: "we're at the stage right now, just actually producing in mass, which is the hardest thing to do for any

manufacturer, you know, to go from zero to producing five or ten or fifteen a day eventually. So that's kind of where we're at…. this year's milestone is five a day, you know, maybe by March, by the end of March, then 10 a day by the end of June."

- On January 28, 2021, in another interview with Jack Spencer, Schrader stated: "our goal, our milestone still is to try to have, you know, try to get to 5 a day sometime in March, by the end of the first quarter, okay? Um, and then ten a day sometime by the end of the second quarter. You know, so those are our milestones, and hopefully we hit those, um, but that's again if we hit those then we should be on target for our 1,800 for this year."

133. By March 1, 2021, Hughes, knowing that the public would not be fooled for much longer, used slightly more cautionary language when describing the 1,800 unit target. He stated: "While we believe this is a feasible goal, it's a stretch. But given our backlog, we cannot sacrifice future build volume for current year production and scaling up manufacturing, properly, has to take precedence."

134. However, Schrader did not back down from his assertions that Workhorse was ready and able to scale up their production capabilities. He stated: "[W]e're trying to get to a target of three a day, sometime here at this month. And then also, we kind of will continue to keep out our 10 a day by the end of sometime in June or by the end of the second quarter. So, that's kind of our goal."

135. On May 10, 2021, the truth about was revealed when they announced that Workhorse had only delivered six trucks in the first quarter 2021 and had only produced thirty eight trucks so far that year – approximately 2% of the 1,800 truck target. On this news, the price of Workhorse stock dropped to a low of $8.20/share. As Defendants' fraudulent scheme was gradually exposed, Plaintiffs, and those similarly situated, suffered economic losses.

– 47 –

**INSIDER SELLING**

136. Despite the harm to Workhorse, the Inside Selling Defendants did not fare so poorly because, while in possession of material, adverse, non-public information, sold shares of the Company's stock at inflated prices before the truth about the Company's business, operations, and financials was revealed. These insider sales were executed under highly suspicious circumstances, including approximately $49,833,007.28 in insider sales during the Relevant Period, while the Company's stock price was artificially inflated as a result of the misstatements detailed above.

137. The insider sales are reflected below:

| Insider | Transaction Date | Number of Shares Sold | Proceeds |
|---------|------------------|-----------------------|----------|
| **Hughes** | 7/13/2020 | 10,546 | $165,255.82 |
| | 7/13/2020 | 40,516 | $670,944.96 |
| | 7/13/2020 | 11,451 | $196,499.16 |
| | 9/17/2020 | 50,000 | $1,289,000.00 |
| | 10/16/2020 | 50,000 | $1,150,000.00 |
| | 12/15/2020 | 55,989 | $1,209,922.29 |
| | 1/4/2021 | 25,000 | $518,250.00 |
| | 1/7/2021 | 100,000 | $2,500,000.00 |
| | 1/26/2021 | 100,000 | $2,800,000.00 |
| | 1/26/2021 | 100,000 | $3,000,000.00 |
| | 2/1/2021 | 25,000 | $899,250.00 |
| **Schrader** | 12/14/2020 | 15,152 | $332,131.84 |
| **Willison** | 7/15/2020 | 19,920 | $325,492.80 |
| | 1/26/2021 | 150,000 | $4,500,000.00 |
| **Chess** | 7/15/2020 | 27,365 | $452,617.10 |
| | 8/17/2020 | 4,000 | $61,280.00 |
| | 9/15/2020 | 4,000 | $101,640.00 |
| | 10/15/2020 | 4,000 | $89,560.00 |
| | 11/16/2020 | 4,000 | $77,040.00 |
| | 12/18/2020 | 5,000 | $105,250.00 |
| | 1/7/2021 | 10,000 | $247,700.00 |
| | 1/15/2021 | 4,853 | $118,704.38 |
| | 2/16/2021 | 5,000 | $179,900.00 |
| | 3/15/2021 | 5,000 | $83,350.00 |
| | 4/15/2021 | 5,000 | $62,950.00 |
| | 5/17/2021 | 5,000 | $40,000.00 |
| **Samuels** | 8/18/2020 | 100,000 | $1,680,000.00 |

|  | 8/18/2020 | 100,000 | $1,662,000.00 |
|---|---|---|---|
|  | 8/18/2020 | 300,000 | $4,962,000.00 |
|  | 11/20/2020 | 33,333 | $833,448.33 |
|  | 11/20/2020 | 33,333 | $834,181.66 |
|  | 11/20/2020 | 33,333 | $833,391.67 |
|  | 1/4/2021 | 33,333 | $690,993.09 |
|  | 1/4/2021 | 33,333 | $690,993.09 |
|  | 1/4/2021 | 33,333 | $690,993.09 |
|  | 1/7/2021 | 33,333 | $866,658.00 |
|  | 1/7/2021 | 33,333 | $866,658.00 |
|  | 1/7/2021 | 33,333 | $866,658.00 |
|  | 1/26/2021 | 33,333 | $933,324.00 |
|  | 1/26/2021 | 33,333 | $999,990.00 |
|  | 1/26/2021 | 33,333 | $1,066,656.00 |
|  | 1/26/2021 | 33,333 | $933,324.00 |
|  | 1/26/2021 | 33,333 | $999,990.00 |
|  | 1/26/2021 | 33,333 | $1,066,656.00 |
|  | 1/26/2021 | 33,333 | $933,324.00 |
|  | 1/26/2021 | 33,333 | $999,990.00 |
|  | 1/26/2021 | 33,333 | $1,066,656.00 |
| **Budde** | 8/31/2020 | 50,000 | $886,000.00 |
|  | 1/26/2021 | 10,000 | $309,800.00 |
| **Demott** | 9/28/2020 | 50,000 | $1,307,000.00 |
|  | 12/14/2020 | 62,450 | $1,368,904.00 |
|  | 3/15/2021 | 4,000 | $66,680.00 |
| **Mader** | 11/24/2020 | 8,000 | $240,000.00 |
|  | **Totals:** | **2,121,236** | **$49,833,007.28** |

138. As a result of the foregoing, these individuals sold millions of shares and amassed nearly $50 million in ill-gotten gains.

139. Yet, in the nearly three months since the Securities Class Action was filed and the artificial inflation was removed from Workhorse's common stock, after the Individual Defendants mostly ceased trading until the Workhorse stock was targeted by the Reddit community. Likewise, the Individual Defendants sold no Workhorse common stock at any time before the start of the Relevant Period.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**A.      Fiduciary Duties**

140.      By reason of their positions as officers, directors, and/or fiduciaries of Workhorse, and because of their ability to control the business and corporate affairs of Workhorse, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Workhorse in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Workhorse and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

141.      Each director and officer of the Company owed, and owes, to Workhorse and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

142.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of Workhorse, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Workhorse, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and financial prospects so that the market price of the Company's stock would be based on truthful and accurate information.

143.    Because of their advisory, executive, managerial, and directorial positions with Workhorse, each of the Individual Defendants had access to adverse, non-public information about the Company.

144.    To discharge their duties, the officers and directors of Workhorse were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Workhorse were required to, among other things:

(a)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

(b)    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

(d)    remain informed as to how Workhorse conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Workhorse and procedures for the reporting of the business

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

**B.      Audit Committee Duties**

145.     In addition to these duties, the Audit Committee Defendants owed specific duties to Workhorse under the Audit Committee's Charter (the "Charter"). According to the Charter, the Audit Committee is responsible for the following:

> The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the Company's registered public accounting firm (the "independent auditor"), in accordance with its business judgment..
>
> Management is responsible for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting.
>
> *      *      *
>
> Oversight. The Audit Committee shall coordinate the Board['s] oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

<u>Procedures for Complaints</u>. The Audit Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

<u>Related-Party Transactions</u>. The Audit Committee shall review all "related party transactions" (defined as transactions required to be disclosed pursuant to Item 404 of Regulation S-K) on an ongoing basis, and all such transactions shall be approved by the Audit Committee.

Additional Powers. The Audit Committee shall have such other duties as may be delegated from time to time by the Board.

146.    Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the Audit Committee Defendants as those set forth above.

**C.    Duties Pursuant to the Company's Code of Ethics**

147.    The Individual Defendants, as officers and/or directors of Workhorse, were also bound by the Company's Code of Ethics (the "Code of Ethics") which sets out basic principles to guide all directors, officers, and employees of Workhorse, who are required to know and conduct themselves in accordance therewith, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

148.    The 2020 Proxy Statement (defined above) states that the Code of Ethics "applies to all of our directors, officers and employees including our [CEO] and [CFO] and principal accounting officer."

149.    As a "General Statement of Policy," the Company's Code of Ethics states the following:

- Honesty and candor in our activities, including observance of the spirit, as well as the letter of the law;
- Avoidance of conflicts between personal interests and the interests of the Company, or even the appearance of such conflicts;

\*    \*    \*

- Compliance with generally accepted accounting principles and controls;
- Maintenance of our reputation and avoidance of activities which might reflect adversely on the Company; and
- Integrity in dealing with the Company's assets.

150.    In a section titled, "Honesty, Candor and Observance of Laws," the Code of Ethics states the following:

    a.    Violations of the Code of Ethics or any of the Company's rules of conduct in effect will constitute grounds for disciplinary action, up to and including termination. Associates are expected to act fairly and honestly in all transactions with the Company and with others and to maintain the high ethical standards of the Company in accordance with this Code of Ethics.

\*    \*    \*

Discovery of events of a questionable, fraudulent or illegal nature or which appear to be in violation of the Code of Ethics must be promptly reported. Failure to report such events also constitutes a violation of the Code of Ethics.

151.    The section of the Code of Ethics titled, "Honesty, Candor and Observance of Laws," further states the following:

The Company strives to comply with all the laws and regulations that are applicable to its business. As a good citizen, the Company emphasizes good faith efforts to follow the spirit and intent of the law.

152.    In a section titled, "Candor Among Associates and in Dealing with Auditors and Counsel," the Code of Ethics states the following:

Senior management of the Company must be informed at all times of matters that might adversely affect the reputation of the Company, regardless of the source of such information. Concealment may be considered a signal that the Company's policies and rules can be ignored, and such conduct cannot be tolerated. Moreover, complete candor is essential in dealing with the Company's independent auditors and attorneys.

153.    In a section titled, "Securities, Investment and Trading," the Code of Ethics states the following:

Associates must never make changes in their personal investment portfolios on the basis of confidential information relating to the Company or obtained through the Company's business. In addition, associates are expected to follow the Company's Guidelines For Trading Common Stock and any other internal policies and procedures in effect from time to time.

*　　*　　*

Significant federal laws govern the disclosure of material, non-public information or trading in the Company's [c]ommon [s]tock on the basis of any such information. Those who disclose confidential information to an outsider who either trades on the information or passes the information along will be subject to the same sanctions as if they had traded the Company's [c]ommon [s]tock themselves.

154.    Upon information and belief, the Company maintained versions of the Code of Ethics during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**D.    Control, Access, and Authority**

155.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Workhorse, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Workhorse.

156.    Because of their advisory, executive, managerial, and directorial positions with Workhorse, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Workhorse.

157.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Workhorse and was at all times acting within the course and scope of such agency.

### E. Reasonable and Prudent Supervision

158.    To discharge their duties, the officers and directors of Workhorse were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Workhorse were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide shareholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

(d)    remain informed as to how Workhorse conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)    refrain from trading on material, adverse, non-public information; and

(f)    ensure that Workhorse was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

159.    The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and/or directors of Workhorse, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

160.    The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public and artificially inflating and maintaining the market price of Workhorse's securities by making, or causing to be made, untrue statements and omissions about Workhorse's business, operational, and compliance policies, including that: (i) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its NGDV, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its NGDV; (ii) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; (iii) the Company failed to maintain internal controls; and (iv) as a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

161.    The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action.  As a result of these and other breaches of fiduciary duties, Workhorse has expended, and will continue to expend, significant sums of money.

162.    Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Workhorse, were able to, and did, directly, and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Workhorse.

163. Specifically, as members of the Audit Committee, the Audit Committee Defendants breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, and financial prospects.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

164. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

165. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

166. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, corporate waste, unjust enrichment, and violations of the federal securities laws; and (b) disguise and misrepresent the Company's actual business and financial prospects.

167.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

168.     Each of the Individual Defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and in furtherance of the wrongdoing.

### DAMAGES TO WORKHORSE

169.     As a result of the Individual Defendants' wrongful conduct, Workhorse conducted its affairs in evident violation of federal and state laws and regulations.  In addition, the Company was caused to disseminate false and misleading statements, and to omit material information to make such statements not false and misleading when made.  This misconduct has devastated Workhorse's credibility.  Further, Workhorse is the subject of the Securities Class Action. Workhorse has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

170.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Workhorse's market capitalization has been substantially damaged as a result of the conduct described herein.

171.    Further, as a direct and proximate result of the Individual Defendants' conduct, Workhorse has expended, and will continue to expend, significant sums of money.   Such expenditures include, without limitation:

a)    Costs incurred in connection with being named a defendant in the Securities Class Action, including the defense and settlement of or judgement in the litigation, as well as any other related litigation based on the same facts;

b)    Costs incurred in connection with the lavish and unjustified compensation and benefits paid to management while they were actively breaching their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, which was based, at least in part, on Workhorse's artificially-inflated stock price;

c)    Costs incurred in connection with the Insider Selling Defendants' misappropriation of Company information in connection with their unlawful insider sales;

d)    Costs incurred from the loss of the Company's customers' confidence in Workhorse and its products and services; and

e)    Costs associated with the reputational harm suffered by Workhorse as a result of the misconduct detailed herein, including loss of goodwill, increased borrowing costs, and loss of market capitalization and the resulting impact on the Company's ability to access the capital markets to raise money.

172.    Moreover, these actions have irreparably damaged Workhorse's corporate image and goodwill.  For at least the foreseeable future, Workhorse will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Workhorse's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered severe

losses in market capitalization as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE AND WRONGFUL REFUSAL ALLEGATIONS

173.    Plaintiffs incorporate by reference all prior paragraphs as if full set forth herein.

174.    Plaintiffs bring this action derivatively, in the right and for the benefit of Workhorse, to redress injuries suffered, and to be suffered, by Workhorse as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Workhorse is named as a nominal defendant solely in a derivative capacity.

175.    Plaintiffs will adequately and fairly represent the interests of Workhorse in enforcing and prosecuting its rights.

176.    Plaintiffs are and have continuously been Workhorse shareholders since prior to the start of the Relevant Period, and have been shareholders at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein.

177.    Plaintiffs David Cohen and Daniel Cohen made their formal demand for litigation (the "Demand") on July 1, 2021, where they demanded that the Board (i) undertake (or cause to be undertaken) an independent internal investigation into Individual Defendants' violations of Nevada and federal law; and (ii) commence a civil action against Individual Defendants (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Individual Defendants) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein, as well as take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future.  **Exhibit A.**

178.     Plaintiffs described how the Individual Defendants have violated the core fiduciary duty principles described herein during the Relevant Period through their wrongful conduct described above, in the Securities Class Action, and the California Derivative Action.  To redress these wrongs and prevent such wrongdoing from occurring again in the future, Plaintiffs demanded:

- The Board should require [m]anagement to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action[] or any related or similar litigation;

- The Board should require [m]anagement to return to Workhorse all salaries, bonuses, ill-gotten gains from illicit stock sales, and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Workhorse;

- Appoint an independent Chairman of the Board;

- Implement and develop procedures for greater shareholder input into the policies and guidelines of the Board;

- Permit Workhorse shareholders to nominate three candidates for election to the Board;

- The Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

- The Board should terminate and immediately replace Hughes and Schrader with independent directors.

- The Board should require [m]anagement to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of their culpable conduct; and

- The Board should adopt and implement internal controls and systems at the Company as well as corporate governance measures to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future, such as, but not limited to, limiting director terms to three years and staggering director terms.

*Id*.

179.    On August 2, 2021, Plaintiffs' counsel received a letter from Ms. Bridget Russell for Sheppard, Mullin, Richter & Hampton LLP acknowledging receipt of the Demand and stating "[t]he Board believes that in light of the multiple pending securities class actions and shareholder derivative actions involving the same matters alleged in the Demand, taking further action in response to your Demand is not a prudent use of Company resources at this time" and "[t]he Board also believes it is appropriate to defer consideration of the Demand until such time as these shareholder derivative actions are resolved." **Exhibit B.**

180.    Plaintiffs' counsel responded on August 13, 2021 (the "August 13 Letter"), reminding the Workhorse that "[i]f the Board continues to fail to substantively respond or investigate the claims made in the Demand, the Board's inaction will justify [s]tockholders' pursuit of the litigation requested in the Demand.  A board cannot simply point to a pending, parallel lawsuit in order to justify its inaction in a derivative suit."[13]  Plaintiffs' counsel also demanded a substantive response by August 20, 2021, but the Board chose to ignore the letter.  **Exhibit C.**

181.    Since Plaintiffs' August 13 Letter, Workhorse has not responded substantively or otherwise, but has chosen to continue ignoring the Demand.

182.    Here, the Board has determined, without any investigation, to defer consideration of the Demand indefinitely – throughout the pendency of the Securities Class Action, California Derivative Action, and several Nevada state court actions, which could span months and even years into the future, particularly in the event that the Securities Class Action proceeds to summary judgment briefing and/or trial, and any appeal(s).  *See, e.g.*, **Exhibit B.**

183.    Making matters worse, an Amended Complaint was filed in the Securities Class Action that brought forth allegations from numerous confidential witnesses formerly employed by

---

[13] *See Witchko v. Schorsch*, No. 15-cv-6043 (AKH), 2016 WL 3887289 (S.D.N.Y. June 9, 2016).

the Company.  *See* Securities Class Action, ECF No. 64 (the "Securities Class Action Amended Complaint").

184.    For example, with respect to Workhorse never having the ability to manufacture on a scale that could meet USPS's Next Gen project, the Securities Class Action Amended Complaint included numerous witness statements that should have been at least investigated by the Board.  A materials manager who left the Company in February 2021, stated that as of the end of 2020 there was not an assembly production in place, and that each vehicle had to be made individually.  At the time of the materials manager's departure, there were still some basic design issues, such as parts not fitting together correctly, and workers were "struggling to finish vehicles."  Additionally, the former employee stated, "a lot of parts still required engineering approval."  *Id*.

185.    The Securities Class Action Amended Complaint also quoted an Executive Director of Human Resources from December 2019 through June 2020 ("CW2" in the Securities Class Action Amended Complaint), who reported directly to Defendant Schrader, stated that Workhorse "never had" an actual manufacturing facility to produce vehicles at the Union City, Indiana facility because there was "no automation, zero automation."  CW2 stated that workers assembled vehicles – which he believed were mostly just prototype vehicles – on wooden workshop tables.  Further, during his tenure, there were only twelve employees in the plant, including engineers.  At least four engineers left Workhorse during CW2's tenure.  When asked if there was a timeline for hiring the workers necessary to increase production, CW2 said, "[h]ell no," and even if there had been, the Company had "no cash flow" by which to go forward with such hiring.  *Id.*

186.    In order to remedy this situation, CW2 stated COO Willison and an associate of his, Brian Carr, formed a staffing company called Electric Vehicle Fleet Services ("EVFS") that had "no history" but was retained by Workhorse to provide temporary staffing for everything from

engineers to sanitation services. Brian Carr is also a partner in eTrucks – a fictitious company which placed an order of 20 Workhorse trucks in July, 2020. According to CW2, EVFS billed Workhorse upwards of 60% to 70% more than the hourly rate mark-up for temporary staffing. While the EVFS website was disabled at some point in June, 2021, a cached version of the website lists Brian Carr as CEO of the company. *Id.*

187. When CW2 reported his concerns over the high mark-ups being charged by EVFS to the Company's controller, he began to feel that Workhorse was "looking to get rid of me." Even though CW2 "didn't do payroll" he was terminated soon after expressing his concerns for "payroll discrepancies." *Id.*

188. When asked about Workhorse's claims that it would be able to produce 300–400 trucks by the end of 2020, CW2 stated this was an "absolute lie," that there was "no way" Workhorse would have been able to meet this target because there was "no automation." *Id.*

189. The Securities Class Action Amended Complaint also quoted another former employee, a buyer/planner employed at Workhorse from March 2020 through October 2020, who similarly did not believe Workhorse had the capacity to produce 300–400 trucks by the end of 2020, stating that the Company "booked numbers they didn't have." *Id.*

190. Specifically, the harms complained of in the Demand are actively ongoing and remain unremedied by the Board, causing further damage to the Company with each passing day.

191. In addition, while the Board is refusing to consider the allegations in the Demand, it is also actively forcing the Company to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the Company in the Securities Class Action, thereby further damaging the Company.

192.    Moreover, the Board's deferral will subject the Company's claims to the applicable statute of limitations period.  These actions by the Board cannot be reasonably interpreted to be in the best interests of the Company or in good faith.

193.    Thus, the Board's unwarranted and egregious deferral of its consideration of the Demand will unduly prejudice Plaintiffs and the Company and is therefore a violation of Nevada law.  The Board's actions thus constitute a wrongful refusal of the Demand.  Accordingly, Plaintiffs have satisfied Nevada's demand requirement and may pursue this action on behalf of the Company.

## CAUSES OF ACTION

### COUNT I

**Breach of Fiduciary Duties for Disseminating False and Misleading Information
to Shareholders (Individual Defendants)**

194.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

195.    As alleged in detail herein, each of the Individual Defendants owed, and owe, Workhorse and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision.  These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor.  To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and complete information to shareholders at all times.

196.    In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the Company's business, operational, and compliance policies, including that: (i) Workhorse was just hopeful that the USPS

would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (ii) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; (iii) the Company failed to maintain internal controls; and (iv) as a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times. Through their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

197. As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Workhorse has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198. Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties for Failure to Maintain Internal Controls
### (Director Defendants)

199. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

200. As alleged in detail herein, each of the Individual Defendants had a duty to exercise good faith in order to ensure that the Company maintained adequate internal controls. When put on notice of problems with Workhorse's business, operational and compliance policies, and/or internal controls, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

201.    In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Workhorse's internal-control practices and procedures, and failed to make a good-faith effort to correct the problems or their recurrence.  As directors and/or officers of Workhorse, the Individual Defendants were responsible for the authorizing of, or the failure to monitor, the business practices which resulted in violations of the law as alleged herein. Each of the Individual Defendants had knowledge of and actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

202.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Workhorse has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

203.    Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

## COUNT III

**Breach of Fiduciary Duties for Failure to Oversee and Manage the Company
(Director Defendants)**

204.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

205.    As alleged in detail herein, each of the Individual Defendants had a duty to exercise prudent oversight and supervision of Company officers and other employees to ensure that they conducted Workhorse's affairs in conformity with all applicable laws and regulations.

206.    In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision, and willfully or in bad faith, allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, and in a manner that grievously harmed the best interests of the Company and its shareholders, rather than protecting those interests.

207.     As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Workhorse has sustained significant damages, not only financially, but also to its reputation, corporate image, goodwill, and ability to continue as a going concern.

208.     As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Workhorse has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.     Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

**COUNT IV**

**Unjust Enrichment (Individual Defendants)**

210.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

211.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Workhorse.

212.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Workhorse.

213.     Plaintiffs, as shareholders and representatives of Workhorse, seek restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants' proceeds from their misconduct, and/or an order requiring the Individual Defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

214.     As a direct and proximate result of these Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

215.     Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets (Individual Defendants)

216.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

217.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Workhorse's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

218.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the Securities Class Action.

219.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

220.    As a direct and proximate result of these Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

221.    Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

## COUNT VI

**Violations of Section 14(a) of the Exchange Act (Against Individual Defendants)**

222.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

223.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

225.    Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose that: (i) Workhorse was just hopeful that the USPS would elect to go with an electric vehicle as its Next Generation Delivery Vehicle, and that the USPS did not provide the Company with a guarantee or signal that it would select an electric vehicle as its next generation delivery vehicle; (ii) USPS's opting to turn the whole or majority of USPS delivery vehicle fleet into electric vehicles was not practical nor likely due to the exorbitant costs associated with doing so; and (iii)

the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

226. The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

227. Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and issue false and misleading statements and/or omissions of material fact.

228. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors and the approval of the Issuance Proposal.

229. The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the approval of the Issuance Proposal and the election and/or re-election of Defendants Hughes, Chess, Budde, Samuels, DeMott, Clark, Mader, and Dedo, which allowed them to continue breaching their fiduciary duties to Workhorse.

230.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

231.    Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

### COUNT VII

### Insider Selling (Insider Selling Defendants)

232.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

233.    At the time Defendants Hughes, Schrader, Willison, Chess, Samuels, Budde, DeMott, and Mader sold their Workhorse stock, they knew the undisclosed information described herein and sold such stock on the basis of such information.  That information was material adverse, nonpublic information concerning the Company's business, operations, and prospects.  It was an asset belonging to the Company which Defendants Hughes, Schrader, Willison, Chess, Samuels, Budde, DeMott, and Mader used for their own benefit when they sold Workhorse stock.

234.    At the time of their stock sales, Defendants Hughes, Schrader, Willison, Chess, Samuels, Budde, DeMott, and Mader knew the truth about the Company's business, operations, and prospects.  These stock sales while in possession and control of this material adverse, nonpublic information was a breach of their fiduciary duty of loyalty and good faith.

235.    By the reason of the foregoing, Workhorse was damaged.

236.    Since the use of the Company's nonpublic information for their own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on any profits that Defendants Hughes, Schrader, Willison, Chess, Samuels, Budde, DeMott, and Mader retained thereby.

237.    Plaintiffs, on behalf of Workhorse, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all Defendants for the damages sustained by the Company as a result of the Individual Defendants' wrongdoing as alleged herein;

B.     Directing Workhorse to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Workhorse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Workhorse's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Workhorse to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal-operational control functions.

C.      Awarding to Workhorse restitution from the Individual Defendants, and ordering disgorgement of all profits, insider trading proceeds, benefits, and other compensation obtained by each of them;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  September 20, 2021                **CONNICK LAW, LLC**

By:   *Thomas J. Connick*
_____
Thomas J. Connick (0070527)
25550 Chagrin Blvd., Suite 101
Beachwood, OH 44122
Telephone: (216) 364-0512
Facsimile: (216) 609-3446
tconnick@connicklawllc.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Frank J. Johnson
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

***Counsel for Plaintiffs***

DocuSign Envelope ID: 9DECF2E8-AAD0-4478-8BBB-5C4A8B12C770

## **VERIFICATION**

I, Daniel J. Cohen, am the plaintiff in the within action. I have reviewed the allegations made in the foregoing verified shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 9/15/2021

DocuSigned by:

D7DC4CA041C84F5...

Daniel J. Cohen

**<u>VERIFICATION</u>**

I, David M. Cohen, am the plaintiff in the within action. I have reviewed the allegations made in the foregoing verified shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 9/20/2021

David M. Cohen